UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| PETER ALPERT and REBECCAH DRILL, <br>     Plaintiffs, <br><br> v. <br><br> STARWOOD HOTELS and RESORTS <br> WORLDWIDE and SHERATON <br> OVERSEAS MANAGEMENT, <br>     Defendants. | Case No. 3:14-cv-1872 (SRU) |

## **RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

In this personal injury suit, plaintiffs Peter Alpert and Rebeccah Drill bring claims for negligence and loss of consortium against defendants Starwood Hotels and Resorts Worldwide and Sheraton Overseas Management, relating to spinal cord and other injuries sustained by Alpert while on vacation at the Sheraton Hacienda del Mar Resort in Cabo St. Lucas, Mexico. Compl., Doc. No. 1, at 1. Specifically, plaintiffs allege that defendants: (1) failed to take proper safety precautions for their beach waterfront; (2) failed to properly monitor their beach waterfront; (3) failed to provide proper warnings pertaining to the dangerous waterfront and surf conditions; (4) failed to properly train their management and employees in water safety; and (5) failed to adhere to the appropriate standard of care for water safety for similar waterfront resorts. *Id*. at 7–8. The threshold issue is whether Mexican or Connecticut tort law should apply. I conclude that Mexican law applies, and that plaintiffs fail to meet the "direct and immediate consequence" standard for causation under Mexican law. Accordingly, I grant defendants' motion for summary judgment.

## I. Background

On December 25, 2012, Plaintiff Peter Alpert and his wife, Plaintiff Rebeccah Drill, were staying at the Sheraton Hacienda del Mar Resort ("Resort") located in Cabo San Lucas, Mexico. Def's Mem. Supp. Mot. Sum. J., Doc. No. 73-1, at 1. Alpert and Drill are residents of Massachusetts, and the Resort is managed by Sheraton Overseas Management Corporation through its parent company, Defendant Starwood Hotels. *Id*. at 1, 4; Mem. in Opp'n Def's Mot. Sum. J., Doc. No. 84, at 2. The Resort is a member of a property owners' association called Cabo del Sol, which is comprised of houses, two golf courses, and two hotels including the Sheraton Hacienda del Mar. Mem. in Opp'n Def's Mot. Sum. J., Doc No 84, at 4.

There is no dispute that the waterfront at Hacienda del Mar is dangerous. *Id*. Defendants admit in their answer that "[t]he surf along the coast of Cabo San Lucas is extremely dangerous" and that the waterfront is unprotected and prone to dangerous waves and tides." Def's Answer, Doc. No. 29, at 5. The brochure that Defendants allegedly provided to Alpert upon his arrival, which he denies receiving, states that "seasonal beach changes can result in waves that break directly on to the beach . . . [t]hese conditions can be very dangerous because an inexperienced person[] who . . . is unaware of the oncoming wave may be thrust 'over the falls' head first directly onto the beach or into the shallow water at the sand bar . . . [which] can cause one's head or shoulder to strike the beach or the shallow bottom." Mem. in Opp'n Def's Mot. Sum. J., Doc. No. 84, at 14.

Alpert has been involved in water-related activities since he was young. Beth Alpert Dep. Trans., Doc. No. 73-7, at 32–33. According to Alpert's sister Beth Alpert, Alpert "has taken part in activities such as swimming, sailing on lakes, water skiing, and has taught sailing to others." Beth Alpert Dep. Trans., Doc. No. 73-7, at 32–34. Alpert has "vacationed with his family at beachfront resorts in locations such as Puerto Rico, Saint Kitts, Cabo, Cancun, Cape Cod,

Martha's Vineyard, Nevis, Young Island, and Saint John." Rebeccah Drill Dep. Trans., Doc. No. 73-9, at 22–26. According to Alpert's wife Rebeccah Drill, the family went on a beach vacation once each year for 15 years prior to Alpert's injury, and they stayed at the Hacienda del Mar Resort 10–15 years before the present incident. *Id*. at 24–25.

On December 25, 2012, the date of the subject incident, Alpert went on a whale-watching excursion with his family. Peter Alpert Dep. Trans., Doc. No. 73-10, at 22. Alpert then had lunch with his brother Scott at the Resort, and Scott asked Alpert to accompany him to the ocean afterwards. *Id*. at 24. Scott entered the water first, and was 30 seconds to one minute ahead of Alpert. *Id*. at 25. Scott described the state of the water as "good rough surf." Scott Alpert Dep. Trans., Doc. No. 73-8, at 85. Alpert stated that he was standing in "maybe two feet of water" when he saw a large wave coming toward him. Peter Alpert Dep. Trans., Doc No. 73-10, at 25–26. Alpert "turned around so that [the wave] wouldn't hit [him] in the face," and was struck in the back. *Id*. at 26. He began to tumble around in the surf, and his head hit the bottom of the sand, temporarily paralyzing his arms and legs. *Id*. He floated face down in the water, unable to move, and feared that he would drown. *Id*. Moments later several people grabbed him and pulled him out of the water onto the sand. *Id*. The same wave struck Scott Alpert, but he was not injured because he "ducked" into the ocean wave, and he was further out in the ocean than Alpert. Scott Alpert Dep. Trans., Doc. No. 73-8, at 77–78.

Paramedics eventually arrived at the scene and transported Alpert by ambulance to Ameridad Hospital; Alpert was transferred to UC San Diego trauma center on December 28, 2012. Peter Alpert Dep. Trans., Doc. No. 73-10, at 43. Alpert returned to Massachusetts 11 days later, where he was admitted to the Spaulding Rehabilitation Hospital for rehabilitation and therapy. Pl's Compl., Doc. No. 1, at 6. He was discharged from Spaulding after more than three

weeks, requires continued follow up medical care, and will continue to require such care for the rest of his life. *Id*. Alpert's complaint lists his injuries as blunt trauma to the head, cranial, and cervical spine; severe abrasions to the forehead; central cord syndrome; multiple herniated discs; severe stenosis due to edema; temporary loss of all sensation and movement from the neck down; permanent loss of fine motor coordination in hands and feet; neurogenic bladder; loss of sensation in bowel and bladder; and multiple dental injuries requiring treatment. *Id*. at 5–6.

**II.     Standard of Review**

Summary judgment is appropriate when the record demonstrates that there is no genuine dispute regarding any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d. 520, 523 (2d Cir. 1992) (court is required to resolve all ambiguities and draw all inferences in favor of the non-moving party). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but must present sufficient probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

Only when reasonable minds could not differ regarding the import of the evidence is summary judgment proper. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the non-moving party submits evidence that is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247-48. To present a genuine issue of material fact, there must be contradictory evidence such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 248.

If the non-moving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In such a situation, there can be no genuine issue with respect to any material fact, because a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. *Id.* at 322-23; *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of non-moving party's claim). In short, if there is no genuine issue of material fact, I may grant a motion for summary judgment. *Celotex*, 477 U.S. at 323.

**III.     Discussion**

    A. <u>Choice of Law Analysis</u>

The parties disagree regarding which jurisdiction's law should be applied. The defendants argue for the application of Mexican law, essentially following the traditional *lex loci delictus* rule, which applies the law of the jurisdiction in which the tort took place. The plaintiffs argue that Connecticut law should apply under the more modern "significant relationship test," which calls for the application of the law of the jurisdiction that has the most significant relationship to the controversy in accordance with the principles of the Restatement (Second) of Conflict of Laws. *See O'Connor v. O'Connor*, 201 Conn. 632, 636 (1986). Federal courts apply the choice of law rules of the state in which they sit, and therefore Connecticut choice of law rules govern the dispute in the present case. *See Booking v. Gen. Stat Mgmt.*, 254 F.3d 414, 419 (2d Cir. 2001). Connecticut applies the law of the jurisdiction with the most significant relationship to the lawsuit based on the factors set forth in the Restatement (Second) of Conflict of Laws. *O'Connor*, 201 Conn. at 650. The relevant sections of the Restatement are sections 6 and 145. Section 145 reads:

> Restatement (Second) of Conflict of Laws § 145: The General Principle:
>
> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
>
> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>
>     (a) the place where the injury occurred,
>
>     (b) the place where the conduct causing the injury occurred,
>
>     (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and
>
>     (d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Section 6 reads:

Restatement (Second) of Conflict of Laws § 6: Choice of Law Principles:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws §§ 6, 145 (1971).

The first step is to determine "whether there is an actual conflict between the laws of the jurisdictions involved." *Schwartz v. Liberty Mut. Ins.*, 539 F.3d 135, 151 (2d Cir. 2008). In the present case, the possible choice of law jurisdictions are Mexico, where the alleged tort took place, Massachusetts, where the plaintiffs are domiciled, and Connecticut, where the Resort's parent company is located. Neither party argues that Massachusetts law should apply, and there is no relevant difference between Connecticut and Massachusetts negligence law as it applies to this case. Mem. in Opp'n Def's Mot. Sum. J., Doc. No. 84, at 14 (citing *Greystone Community Reinvestment Assn. v. Berean Capital*, 638 F. Supp. 2d 278, 288 (D. Conn. 2009)). However, there are material differences between Mexican and Connecticut tort law. Under Mexican law: (1) contributory negligence is an absolute bar to recovery, (2) loss of consortium claims are not

recognized, (3) there is a stricter causation standard (requiring "direct and immediate" causation as opposed to Connecticut's "substantial factor" inquiry), and (4) there are significant limits to recoverable damages.

In this case, factors (a), (b), and (d) favor application of Mexican law, because the injury occurred in Mexico, the alleged negligent conduct occurred in Mexico, and the relationship between the parties was centered at the Resort in Mexico. Factor (c) favors neither party, because the plaintiffs are domiciled in Massachusetts, the Resort's parent company is located in Connecticut, and the Resort is located in Mexico. Though more factors weigh in favor of the application of Mexican law, "we need to recall that it is the significance, and not the number, of [section] 145(2) contacts that determines the outcome of the choice of law inquiry under the Restatement approach." *O'Connor*, 201 Conn. at 653. Still, it is important to note that "in the absence of unusual circumstances, the highest scorer on the 'most significant relationship' test is the place where the tort occurred." *Spinozzi v. ITT Sheraton*, 174 F.3d 842, 844–45 (7th Cir. 1999).

Thorough choice of law analysis requires weighing the relative significance of the factors listed in Restatement section 6 as they apply to the facts of this case. The factors most important to the present case are sections 6(2)(a), (b), (c), and (e), and I assign little weight to sections (d), (f), and (g).

With respect to section (d), the facts do not support an inference of justified expectations that Connecticut law would apply; when vacationing abroad, though an American may feel safer in a foreign hotel owned by an American chain, "they do not feel that they are on American soil and governed by American law." *Spinozzi*, 174 F.3d at 846. Indeed, the Seventh Circuit noted in *Spinozzi*, where an Illinois plaintiff was injured at a Mexican resort, that "[w]e doubt that [the

8

plaintiff] would have thought he was carrying his domiciliary law with him, like a turtle's house, to every foreign country he visited." *Id*.

With respect to section (f), applying the law of the place where the injury occurred is "easy . . . and leads to certainty of result" because "[t]he place of injury is readily ascertainable." Restatement (Second) of Conflict of Laws, § 146, cmt. e (1971). Allowing tourists to sue foreign resorts for injuries sustained abroad under the laws of the victim's home state (or any state other than the state in which the injury occurred) would create uncertainty and widely varied results for resort operators. *See Fallhowe v. Hilton Worldwide*, 2015 WL 5081690, at *8 (D. Colo. Aug. 28, 2015).

Regarding section (g), the ease in determination and application of the law to be applied, it would certainly be easier to apply Connecticut law to the present case, as Alpert argues I should. However, the burden imposed by the application of comparatively unfamiliar law is hardly insurmountable, nor is it significant enough to compel me to adopt a "contra-legal position" on the choice of law issues. *See Mastondrea v. Occidental Hotels Management*, 391 N.J. Super. 261, 290 (2007). Certainty and ease of application of law need to be considered, but the Restatement "cautions against attaching independent weight to these auxiliary factors, noting that they are ancillary to the goal of providing rational, fair choice of law rules." *O'Connor*, 201 Conn. at 651. *See also* Restatement (Second), Conflict of Laws, § 6, comment j (1971). For the foregoing reasons I conclude that factors (d) and (f) favor applying Mexican law, and factor (g) favors applying Connecticut law. I turn now to the more important policy factors in sections (a), (b), (c), and (e).

1. <u>The needs of the interstate and international systems: section 6(2)(a).</u>

Alpert argues that section 6(2)(a) favors the application of Connecticut law to best meet the needs of interstate and international systems. He argues that Mexico may have an interest in

9

protecting American companies doing business in Mexico from lawsuits, but concludes that "this interest is strongly outweighed by the interest of the states of Connecticut and Massachusetts to ensure that when an American company promotes vacations to American citizens in facilities they operate overseas, the safety standards and protections are not diminished in any way." Mem. in Opp'n Def's Mot. Sum. J., Doc. No. 84, at 20. In support of their assertion that Mexican law should govern this case, defendants argue that "international relations will be facilitated by the application of Mexican Law," because "the site of injury and all interaction between Plaintiff and Resort occurred in Mexico." Def's Mem. Supp. Mot. Sum. J., Doc. No. 73-1, at 11. The defendants argue that if I do not apply Mexican law, then "any guest from anywhere in the world would be able to sue in their own country, and the hotels would be forced to litigate in a forum in which they have no ties." *Id*.

Alpert's argument for the application of Connecticut law is based on the Resort's parent company's headquarters being located in Connecticut, and therefore defendant's contention that refusing to apply Mexican law would subject the Resort to suit in a jurisdiction in which it has no ties is without merit. He argues that the present case is distinguishable from *Spinozzi*, for example, where the defendant Mexican resort's only tie to plaintiff's home state of Illinois was through advertisement. Furthermore, although it may be true that application of Mexican law will best serve the needs of interstate and international systems, defendants point only to the location of the incident to support that notion.

Plaintiff's arguments in support of the application of Connecticut law are over-simplified. States do have a legitimate interest in the safety of their citizens and in fair compensation for injured citizens. *See Mastondrea v. Occidental Hotels Management*, 391 N.J. Super. 261, 286 (Ct. App. 2007) ("New Jersey has an interest in the fair compensation of injured New Jersey

residents."); *Sacks v. Four Seasons Hotel*, 2006 WL 783441, at *17–18 ("Texas has a strong interest in protecting the rights of its citizens . . . [and] also has a strong interest in controlling conduct of corporations that choose to do business within its borders."). But Mexico has a compelling interest is regulating its tourism industry and setting its own safety standards. In *Spinozzi* the Court noted that "Illinois residents may want a higher standard of care than the average hotel guest in Mexico, but to supplant Mexican [law] by Illinois tort law would disserve the general welfare because it would mean that Mexican safety standards . . . were being set by people having little stake in those standards." *Spinozzi*, 174 F.3d at 845. In *Mastondrea*, where a New Jersey citizen was injured at a Mexican resort, the Court explained that "[w]hile New Jersey has legitimate concerns . . . it cannot exempt them from other states' law setting standards for local conditions and conduct." *Mastondrea*, 391 N.J. Super. at 286.

It is a matter of common knowledge that tourism emanating from the United States is a major industry in Mexico. *See Hernandez v. Burger*, 102 Cal. App. 3d 795, 802 (1980). The *Hernandez* court remarked that "[f]ostering tourism . . . is, of course, a legitimate interest of Mexico and the application of Mexico's limited damages law to nonresident[s] . . . might well advance that interest." *Id*. When deciding a choice of law issue between New York and Mexican law, a New York judge noted that "Mexico's interests are more direct and unambiguous [than New York's] . . . Mexico has a strong substantive interest in encouraging the development of a tourist industry. This includes protecting the reasonable and justifiable expectations of commercial and resort entities within its borders from the severe uncertainty of financial liability arising out of suits in the United States and other foreign jurisdictions." *Feldman v. Acapulco Princess Hotel*, 520 N.Y.S. 2d 477, 486 (Sup. Ct. 1987).

In the present case, Alpert argues that Connecticut law should apply because the majority of the Resort's guests are American. Mem. in Opp'n Def's Mot. Sum. J., Doc. No. 84, at 21. I disagree. As a district judge in Colorado explained, "Mexico has a strong interest in regulating resorts' conduct and ensuring foreign tourists' safety. An overseas resort, no matter how many American tourists comprise its clientele, is not a jurisdictional enclave." *Fallhowe v. Hilton Worldwide,* 2015 WL 5081690, at *6 (D. Colo. Aug. 28, 2015).

The first policy consideration—the needs of the interstate and international systems—seeks to "further harmonious relations between states and to facilitate commercial intercourse between them." Restatement (Second) of Conflict of Laws, § 6, cmt. d (1971). Mexico has a significant interest in applying its tort law to participants in Mexico's tourism industry. Applying Connecticut law to tort claims that arose from events occurring in Mexico would "undermine Mexico's sovereignty and its ability to regulate its resort industry." *Fallhowe*, 2015 WL at *7.

Accordingly, I conclude that this first factor weighs decidedly in favor of applying Mexican law to the present case.

2. <u>The relevant policies of the interested forums, and the basic policies underlying the field of tort law: sections 6(2)(b), (c), and (e).</u>

The Restatement Second explains that in personal injury cases, the choice of law will generally favor the jurisdiction in which the alleged tortious conduct *and* the injury occurred, except in those rare instances where another jurisdiction has a demonstrably dominant interest and no policy of the locus state is frustrated by the application of the sister state's policy. *See Erny v. Estate of Merola*, 171 N.J. 86, 103 (2002); Restatement (Second) of Conflict of Laws*,* § 145 cmt. e; § 146 cmts. c and d. I have already determined that Mexico's policy interest in controlling its tourism industry is more significant than any interest Connecticut may have in applying its own tort law in this case. Connecticut has no interest in the application of

Connecticut tort law that is "demonstrably dominant" to Mexico's interest in regulating negligence standards as they apply to the tourism industry. Moreover, no policy of Connecticut is unduly frustrated by the application of Mexican tort law in this case. I therefore find that Restatement factors (b), (c), and (e) favor the application of Mexican law.

I give the most weight to Restatement section 6 factors (a), (b), (c), and (e), all of which favor the application of Mexican law. I therefore hold that Mexican law applies to this case.

B. Causation Analysis

In order to impose liability, Mexican tort law requires that a plaintiff prove that his or her injury was the immediate and direct result of the defendant's unlawful act. *Summers v. Hotels*, 2013 WL 12113444, at *4 (C.D. Cal. Sept. 20, 2013). "Mexican courts have construed the "immediate and direct consequence" requirement to mean that, in order to impose liability and assess damages, the relationship between a defendant's conduct and the plaintiff's injuries must be so close that there can be no other additional or intervening conduct by another party to which the legal injury or injuries can be attributed." *Id*. When a third party or a fortuitous event contributes to a plaintiff's injury, Mexican law focuses on the foreseeability of that third party's intervention or that event's occurrence to allocate liability between parties. Ryan G. Anderson, *Transnational Litigation Involving Mexican Parties*, 25 St. Mary's L.J. 1059, 1098 (1994) (cited as authority on Mexican tort law by the Second Circuit, *see Curley v. AMR Corp.*, 153 F.3d 5, 13 (2d Cir. 1998)). Article 2111 of the Mexican Civil Code of the Federal District "provides that 'no one is obligated with regard to a fortuitous event or force majeure except when he has caused it or contributed thereto, or when he has expressly accepted such liability, or when the law imposes it.'" *Id*.

In a 1989 paper on the application of Mexican negligence law, Boris Kozolchyk and Martin Ziontz analyzed a series of facts based on a Michigan District Court case in which Ziontz

was one of the attorneys, and Kozolchyk was an expert witness on Mexican law. Boris Kozolchyk, Martin L. Ziontz. *A Negligence Action in Mexico: An Introduction to the Application of Mexican Law in the United States*, 7 Ariz. J. Int'l & Comp. L. 1 (1989) (cited as authority on Mexican tort law by the Second Circuit; *see Curley v. AMR Corp.*, 153 F.3d 5, 13 (2d Cir. 1998)). In the case described in that article, an American couple named Moira and Walt were vacationing at a resort in Mexico. *Id*. at 3. Moira rented snorkeling equipment and ventured down to the beach, passing a small sign at the entrance used by most swimmers that warned of the dangerous surf at the Mexican beach. *Id*. When she was in the water about ten feet from the shoreline, Moira realized that her facemask did not fit properly and was filling with water; as she attempted to drain the water from the mask, she was buffeted by a series of strong waves, forced underwater, and was rendered unconscious. *Id*. Walt was able to rescue Moira from the water unassisted, but when Moira regained consciousness she could not move her legs. She was diagnosed as a permanent paraplegic upon her return to the United States. *Id*.

Kozolchyk and Ziontz explain that "Mexican courts . . . often use the terms force majeur (fuerza mayor) and fortuitous or unforeseeable event interchangeably" and define them as "a future event which is beyond the power of a party to avoid, because it is unforeseeable or, if foreseeable, unavoidable." *Id*. at 28. They define an "unforeseeable event" as one that "impedes the carrying out of an obligation or legal duty and whose presence cannot be determined or conjectured by signals or indications that foreshadow its proximity or arrival." *Id*. Most significantly for the present case, under Mexican law, if there are no physical or objective signals that foreshadow the occurrence of an event, "the question of what is the most reasonable behavior to cope with the likelihood of its arrival is not particularly relevant since the act or event is still deemed unforeseeable." *Id*. Therefore, defenses of fortuitous event and force majeur

are much more powerful in Mexican law than in Anglo-American law, because "certain acts or events will be categorized, a priori, as unforeseeable." *Id*. Indeed, a Mexican judge may treat a supervening act or event as per se fortuitous or as a force majeur without evidence of reasonable behavior or an attempt to mitigate damages. *Id*. at 28–29.

Two Mexican cases illustrate that jurisdiction's treatment of fortuitous events. In *Miguel v. Villarreal*, a drought caused the loss of more than 60% of the plaintiff's cattle. *Kozolchyk*, 7 Ariz. J. Int'l & Comp. L., at 29 (citing *Miguel v. Villarreal*, 1960 Bol. Info. Jud. 408, Tesis 8119 (1960)). The Mexican Supreme Court held that "the defendant, lessee of the land and cattle, was not obligated to return the cattle to his lessor if this lessee could prove the fortuitous event of drought. The lessee proved this by introducing documents in the public record referring to the Coahuilan drought; no proof was required on the drought's reasonable foreseeability or on defendant's mitigation of damages." *Id*. In another case, Mexico's Supreme Court considered a stationary vessel dragged by "winds, hurricanes and impetuous currents" to be a force majeur, and the victims were required to absorb the damages. *Id*. at 29 (citing *Petróleos Mexicanos*, 3 (3a Sala) Semanario 6th 105 (1957)). Kozolchyk and Ziontz conclude that, with respect to their subject case, "a Mexican court could easily regard the suddenness and strength of the waves and undertoe in Moira's case as per se fortuitous or as a force majeur." *Id*.

The present case is analogous to the case discussed by Kozolchyk and Ziontz; the wave that struck Alpert appeared suddenly and forcefully. Though the beach at the Resort was known to be dangerous, the relative strength and sudden formation of any individual wave is entirely unforeseeable. Because there is no way to predict when any such wave will appear, Mexican law does not call for an inquiry regarding the Resort's reasonableness in coping with the likelihood of the wave's arrival. I therefore conclude that, under Mexican law, the sudden, strong wave that

struck Alpert was per se fortuitous, and any alleged negligent acts or omissions by the Resort fall short of the "direct and immediate" causation standard. Accordingly, defendants' motion for summary judgment with respect to causation is granted, and Alpert's cross-motion for partial summary judgment is denied.

IV.     **Conclusion**

For the foregoing reasons, defendants' motion for summary judgment is GRANTED. The clerk shall enter judgment and close this case.

So ordered.

Dated at Bridgeport, Connecticut, this 29th day of October 2018.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge